UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER ANN PUGLIESE,          :
                                :
           Plaintiff            :      No. 4:11-CV-01568
                                :
    vs.                         :      (Judge Kosik)
                                :                      **FILED**
MICHAEL J. ASTRUE,              :                  **SCRANTON**
COMMISSIONER OF SOCIAL          :
SECURITY,                       :                  SEP 1 4 2012
                                :
           Defendant            :      _____
                                       PER _____
                    MEMORANDUM              DEPUTY CLERK

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Jennifer Ann Pugliese's claim for social

security disability insurance benefits and supplemental security

income benefits.

        On September 10, 2008, Pugliese protectively filed[1] an

application for disability insurance benefits and on October 1,

2008, an application for supplemental security income benefits.

Tr. 95-96 and 153-161.[2]  On March 13, 2009, the Bureau of

_____

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on November
10, 2011.

Disability Determination[3] denied Pugliese's applications. Tr. 98-107.   On March 18, 2009, Pugliese requested a hearing before an administrative law judge. Tr. 108-109.   After about 11 months had passed, a hearing was held on February 16, 2010, before an administrative law judge. Tr. 28-94.   On May 28, 2010, the administrative law judge issued a decision denying Pugliese's applications. Tr. 19-27.   Pugliese then requested that the Appeals Council review[4] the administrative law judge's decision and on July 7, 2011, the Appeals Council concluded that there was no basis upon which to grant Pugliese's request. Tr. 1-6.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Pugliese then filed a complaint in this court on August 23, 2011.   Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on February 7, 2012, when Pugliese filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the

---

3.   The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.   Tr. 99 and 104.

4.   Our review of the record did not reveal the date of the request or a formal document requesting that the Appeals Council review the ALJ's decision.

5.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Pugliese meets the insured status requirements of the Social Security Act through December 31, 2012. Tr. 19 and 21.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Pugliese, who was born in the United States on February 28, 1979,[6] graduated from high school and can read, write, speak and understand the English language. Tr. 155, 185 and 194. During her elementary and secondary schooling, Pugliese attended regular education classes. Tr. 194. After high school, Pugliese attended "business school, college, like, trade school" for 1 ½ years. Tr. 38. Specifically, Pugliese took courses to become a medical secretary but Pugliese after completing those courses never worked as a medical secretary. Id.

---

6. Pugliese is considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations use that term to describe an individual 18 through 49 years of age. 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Pugliese was 30 years of age and at the time of the administrative law judge's decision 31 years of age. Tr. 35 and 95.

A vocational expert testified that Pugliese had past relevant employment[7] as a mortgage loan processor and as an office manager of a cell phone store. Tr. 78-79.  The position of mortgage loan processor was described as skilled, sedentary work and the officer manager position as skilled, light work.[8]  Id.

---

7.  Past relevant employment in the present case means work performed by Pugliese during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If
> <span style="float:right">(continued...)</span>

4

Pugliese's work and earnings history spans the years 1995 through 2008. Tr. 175 and 223. Records of the Social Security Administration reveal that Pugliese had earnings as follows:

| Year | Earnings |
|------|----------|
| 1995 | $   755.74 |
| 1996 | 123.98 |
| 1997 | 4068.53 |
| 1998 | 1642.61 |
| 1999 | 1454.90 |
| 2000 | 1135.54 |
| 2001 | 12132.38 |
| 2002 | 6634.35 |
| 2003 | 19080.26 |
| 2004 | 10434.33 |
| 2005 | 24978.33 |
| 2006 | 12504.00 |
| 2007 | 27890.00 |
| 2008 | 18990.00 |

Tr. 175. Pugliese's total earnings from 1995 through 2008 were $141,824.95. Id.

Pugliese claims that she became disabled on September 9, 2008, because of Lyme disease,[9] depression, anxiety, obsessive

---

8.   (...continued)
someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

9.   "Lyme disease is a bacterial infection spread through the bite of the blacklegged tick. . . Lyme disease is caused by

(continued...)

compulsive disorder, attention deficit disorder, chronic fatigue syndrome, multiple arthralgias (joint pain), Babesiosis,[10] Raynaud's disease,[11] temporomandibular joint disorder and rheumatoid arthritis. Tr. 98 and 186.  Pugliese has not worked since September 30, 2008. Tr. 186.

Although Pugliese claims that she has been disabled and unable to work since September 9, 2008, the record reveals that Pugliese applied for and received unemployment compensation benefits during the first, second and fourth quarters of 2009 in the amounts of $3920.00, $280.00 and $5396.00, respectively.[12] Tr.

---

9.   (...continued)
bacteria call Borrelia burgdorferi (B. Burgdorferi). Blacklegged ticks carry these bacteria. . . ." Lyme disease, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002296/ (Last accessed September 11, 2012).  Symptoms of Lyme disease include fatigue, chills, fever, headache, muscle pain and weakness, a stiff neck, speech problems, joint swelling, memory and concentration problems and vision problems. Id.

10.  Babesiosis is a malaria-like parasitic disease of the red blood cells. Parasites - Babesiosis, Centers for Disease Control and Prevention, http://www.cdc.gov/parasites/babesiosis/ (Last accessed September 11, 2012).

11.  "Raynaud's . . . disease is a condition that causes some areas of [the] body - such as [the] fingers, toes, the tips of [the] nose and [the] ears - to feel numb and cool in response to cold temperatures or stress. In Raynaud's disease, smaller arteries that supply blood to [the] skin narrow, limiting blood circulation to affected areas."  Raynaud's disease, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/raynauds-disease/DS00433 (Last accessed September 11. 2012).  People who smoke are at an increased risk for this disease. Id.

12.  An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S.
(continued...)

6

172.  When asked at the administrative hearing whether she was presently receiving unemployment compensation benefits, her answer was in the affirmative. Tr. 73.

At the administrative hearing, Pugliese claimed that she could not "even do simple, basic math anymore without the use of a calculator." Tr. 35.  In a document entitled "Function Report – Adult" Pugliese claimed that she had difficulty lifting, squatting, standing, walking, sitting, kneeling, talking, hearing, stair climbing, seeing,  completing tasks, concentrating, understanding, following instructions, using her hands and getting along with others. Tr. 251.  She also claimed she had memory problems. Id.

In the function report, Pugliese stated she lives with her son, who at the time was 8 years old. Tr. 246-247. She also elaborated on her family responsibilities, including taking care of her son who had Lyme disease, anxiety, bipolar disorder and attention deficit hyperactivity disorder. Tr. 247.  Specifically, Pugliese stated as follow: " Give my son cereal for breakfast, take him to school, then go back to bed. Watch TV in bed, pick my

---

12.  (...continued)
§801(d)(1).  Also, in order to collect unemployment compensation benefits the recipient must engage in a job search and periodically report to the unemployment office regarding the steps he or she has taken to obtain employment. The fact that Pugliese collected unemployment compensation after her alleged disability onset date of September 9, 2008, suggests that she represented when applying for such benefits that she was able and willing to accept employment and that she actively engaged in a job search.

son up from school. Rest on the couch, go to my parents for dinner. Put son in bed and then I go to bed." Tr. 246.  Although Pugliese acknowledged she was able to drive, go grocery shopping, take care of her son, prepare simple meals, clean and do the laundry, she claimed that she was paralyzed on the right side and was unable to dress. Tr. 247-249.  Pugliese admitted that she was able to count change and use a savings account. Tr. 249.  When given an opportunity to do so, Pugliese did not indicate that she had a problem with bending or reaching. Tr. 251. Pugliese watches TV and socializes with friends. Tr. 250.

For the reasons set forth below, we will affirm the decision of the Commissioner denying Pugliese's applications for disability insurance benefits and supplemental security income benefits.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence.");  Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176
(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

        Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record, substantial evidence may be "something less than the
weight of the evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not prevent an
administrative agency's finding from being supported by

9

substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383
U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S.
474, 488 (1971). A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence. <u>Mason</u>, 994
F.2d at 1064. The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642
F.2d at 706-707. Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole. <u>Smith v.
Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.
Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment

10

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[13] (2) has an impairment that is severe or a combination of impairments that is severe,[14] (3) has

---

13.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

14.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant

(continued...)

an impairment or combination of impairments that meets or equals

the requirements of a listed impairment,[15] (4) has the residual

functional capacity to return to his or her past work and (5) if

not, whether he or she can perform other work in the national

---

14.  (...continued)
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

15.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing, an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

economy. Id.  As part of step four, the administrative law judge

must determine the claimant's residual functional capacity. Id.[16]

      Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary

work setting on a regular and continuing basis.  See Social

Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

regular and continuing basis contemplates full-time employment and

is defined as eight hours a day, five days per week or other

similar schedule. The residual functional capacity assessment must

include a discussion of the individual's abilities.  Id; 20 C.F.R.

§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an

individual is still able to do despite the limitations caused by

his or her impairment(s).").

**MEDICAL RECORDS**

      At this point, we will review some of the medical

records.  The relevant time period is from September 9, 2008, the

alleged disability onset date, to May 28, 2010, the date the

administrative law judge issue the decision denying Pugliese

benefits.  Pugliese was treated for both physical and psychiatric

problems.

---

16.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

13

Pugliese was examined by Norton Fishman, M.D., in
September, 2008. Tr. 367-368.  Dr. Fishman ordered several blood
tests, including tests for Lyme disease. Tr. 512-517.  Based on
Pugliese's symptoms, the results of a physical examination of
Pugliese and the results of blood tests, Dr. Fishman diagnosed
Pugliese as suffering from Lyme disease. On December 10, 2008, Dr.
Fishman completed a barely legible medical source statement of
Pugliese's ability to perform work-related functional activities.
Tr. 358-359.  In that statement, Dr. Fishman opined that Pugliese
could rarely lift 2-3 pounds and occasionally carry 2-3 pounds;
and Pugliese could not stand or walk due to weakness, could not
sit due to rib pain, and could not push or pull due to fatigue.
Tr. 358.  Dr. Fishman indicated that Pugliese could occasionally
bend, but could never perform other postural activities, and that
she had handling, reaching, and fingering limitations, and other
environmental restrictions, including avoidance of heights, moving
machinery and dust. Tr. 359.  Dr. Fishman diagnosed Pugliese as
suffering from "Lyme disease with co-infection of Babesia and
Bartonella-like organisms"[17] and "Chronic Fatigue Syndrome with

_____

17.  Bartonella is a genus which "comprises at least 26 species
or subspecies of vector-transmitted bacteria[,]" Emerging
Infectious Diseases Journal, Center for Disease Control and
Prevention, http://wwwnc.cdc.gov/eid/article/18/5/11-1366
_article.htm (Last accessed September 10, 2012).  There was a
blood smear of Pugliese's blood examined on September 15, 2008,
(continued...)

14

cognitive dysfunction and vasomotor instability, secondary to the
Lyme Disease." Tr. 450.

A review of the laboratory reports reveal, however, that
the blood tests were inconclusive. In fact, Carla Huitt, M.D.,  a
state agency physician, reviewed all of Pugliese's medical records
including the results of the blood tests and concluded on February
23, 2009, that Pugliese could not be diagnosed with Lyme
disease.[18] Tr. 505-506.  In order for a conclusive diagnosis of
Lyme disease, the following three tests must be positive: IgM, IgG
and Western Blot.[19] IgM and IgG are antibodies that appear in the
blood as the result of the patient being infected with the

17.   (...continued)
at Fry Laboratories located in Scottsdale, Arizona, which
revealed "[r]are coccobacilli adherent to Erythrocytes [red blood
cells] . . . [which was] suggestive of Hemobartonella or
Mycoplasma spp." Tr. 360. The report of this blood smear noted,
however, that the stain used was "not FDA approved and [was] for
Research use only." Id.

18.   As will be elaborated on in detail infra, the administrative
law judge found that Pugliese's alleged Lyme disease was not a
medically determinable impairment.

19.   One online source by the American Association of Clinical
Chemistry which is peer-reviewed and non-commercial indicates
that if the IgM antibody, IgG antibody and Western Blot tests are
positive you likely suffer from Lyme disease. If you only have a
positive IgM you may have an early infection or the result may be
a false positive.  If you have a negative IgM and a positive IgG
and Western Blot you may have a late infection or previously
suffered from Lyme disease.  If both the IgM and IgG test are
negative, you are not infected. Lab Tests Online, Lyme Disease,
http://labtestsonline.org/understanding/analytes/lyme/tab/test
(Last accessed September 11, 2012).

bacteria, Borrelia burgdorferi. The infection is sustained as the
result of being bitten by a tick which carries the bacteria. Dr.
Huitt noted that the laboratory reports indicated that the Western
blot and IgG were "negative/indeterminate" and that there should
have been a positive result if Pugliese had an active or past
infection. Tr. 505. Dr. Huitt further indicated that the IgM and
Western blot tests were "indeterminate to weakly positive" and
that there would have been an "elevated" result if Pugliese had a
new infection and the IgM antibody "would not be present for [an]
old past infection." Id. Dr. Huitt commenting on the "weakly
positive" IgM result stated that the infection with the Herpes
Simplex virus, the Epstein Barr virus, Hepatitis C virus or
syphilis can lead to a false positive result and that there was no
testing performed with respect to those illnesses. Id. Dr. Huitt
also noted that an indirect florescent antibody (IFA) "test for
IgG, IgM and IgA of Lyme's were negative." Id.[20]   Dr. Huitt found

---

20.  Pugliese also had blood tests for the protozoan parasites,
Babesia duncani and Babesia microti.  These parasites are tick-
borne and cause a blood disease known as Babesiosis. Severe
babesiosis is similar to malaria causing severe fever, shaking,
chills, and anemia. The blood test for Babesia microti was
negative. Tr. 505 and 515. The test for Babesia duncani was
"indeterminate." 505 and 516. Also, it was noted that Babesia
duncani was only found in the Pacific Northwest and that Pugliese
had never traveled to that area of the country. Tr. 22, 55, 505
and 516.

that Pugliese had the physical residual functional capacity to engage in medium work.[21] Tr. 501-503.

In addition to Dr. Fishman, Pugliese was treated by Ira Kornbluth, M.D., a specialist in pain management. Tr. 473-477. A review of the record reveals that Pugliese's initial appointment with Dr. Kornbluth was on March 13, 2009. Id. At that appointment, Pugliese reported that she had "left arm pain of two months that began with onset of Lyme's (sic) disease and was exacerbated when PICC line[22] was inserted." Id. Dr. Kornbluth in the report of this appointment noted that Pugliese had a past medical history of fibromyalgia, arthritis and Lyme disease. Tr.

---

21. On February 4, 2009, Pugliese was examined by Craig A. Sullivan, D.O., for a disability evaluation. Tr. 374-375. Dr. Sullivan noted Pugliese's claim that she suffered from Lyme disease and that "[s]he ha[d] two apparent concurrent infections for which she is receiving intravenous antibiotic therapy." Tr. 374. Dr. Sullivan on physical examination of Pugliese found that she had mild paracervical tenderness with range of motion; she had normal cervical flexion, extension and rotation; she had normal range of motion of the lumbar spine; she had normal range of motion of the shoulders, elbows, wrists and hands; she had clinical findings consistent with Raynaud's disease in both hands; she had normal grip strength; she had some restriction in hip rotation bilaterally; she had normal lower extremity musculature; she had no significant effusion in the knees or collateral or cruciate ligament instability; and she had normal motion of the ankles. Tr. 374-375. Dr. Sullivan's impression was that Pugliese suffered from "rheumatologic inflammatory arthropathy with Raynaud's disease, possible Lyme disease." Tr. 375

22. A PICC line is a peripherally inserted central catheter inserted into a vein of the arm for the administration of antibiotics.

474. A physical examination revealed that Pugliese neurologically was normal. Tr. 475. Pugliese had a stable gait and station, normal 5/5 muscle strength in the upper and lower extremities, normal reflexes, grossly intact cognitive functioning, normal cervical range of motion, grossly normal shoulder range of motion, no lumbar or buttock tenderness, normal hip range of motion and a negative straight leg raise test.[23] Id. Dr. Kornbluth did note that Pugliese's lumbar extension range of motion was limited and he observed multiple fibromyalgia tender points, 11 out of 18, but did not conclude that she suffered from that condition. Id. Instead, he concluded she suffered from chronic pain syndrome, cervicalgia (neck pain), pain in joint involving pelvis/hip and myofascial (muscular) pain. Tr. 476. Dr. Kornbluth also noted that Pugliese was smoking and advised her of the importance of smoking cessation. Id. Dr. Kornbluth prescribed medications and recommended continued conservative treatment. Id.

On March 17, 2009, Dr. Kornbluth discontinued one of the medications, Magnacet (a combination of acetaminophen and

---

23. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed September 11, 2012).

oxycodone), he prescribed on March 13th because it was causing Pugliese to have headaches. Tr. 471. In its place, Dr. Kornbluth prescribed the narcotic Percocet but noted that the plan was to "slowly wean meds as clinically appropriate." Id.

On April 7, 2009, Pugliese told Dr. Kornbluth that she had an increase in right groin pain since the last visit. Tr. 469. Dr. Kornbluth in the report of that appointment stated that "[t]he current medications are providing adequate pain relief and improvement in function without side effects. . . She denies progressive upper and lower extremity weakness." Id. Dr. Kornbluth's diagnosis was the same as the one made on March 13th, but he prescribed the narcotic drug Percocet and ordered an MRI of the right hip. Id.

The MRI of the hip was performed on April 17, 2009, and was essentially normal. Tr. 478. It revealed "[n]o focal abnormality" and only "minimal effusion." Id.

The results of a physical examination performed by Dr. Kornbluth on May 1, 2009, were very similar to the results of the one performed on March 13th, including Pugliese had normal muscle strength in the upper and lower extremities. Tr. 466-467. Dr. Kornbluth did indicate that Pugliese had "moderate tenderness in right groin with palpation of lymph node." Tr. 467. Dr. Kornbluth continued the prescription for Percocet but also prescribed MS

19

Contin (morphine) and ordered an MRI of the lumbar spine. Id.

The MRI of the lumbar spine was performed on May 13, 2009, and was normal. Tr. 448.  It revealed "[n]o evidence of significant disk herniation or bulge,[24] no canal or foraminal stenosis throughout the lumbar spine."[25] Id.  In a report of an appointment Pugliese had with Dr. Kornbluth on May 15, 2009, Dr. Kornbluth noted that the MRI of the lumbar spine was "essentially normal." Tr. 464.

On June 9, 2009, Dr. Fishman issued a conclusory "To whom it may concern" letter which states in toto as follows: "In my medical opinion, taking into account all the symptoms listed in the letter,[26] Jennifer is unable to perform any type of work, including 'desk job' for at least one year, if not longer." Tr. 451.

---

24.  The report of this MRI did note "[a] minimal posterior disk bulge" at the L4-L5 level. Tr. 448.

25.  "Spinal stenosis is a narrowing of one or more areas in your spine – most often in your neck or lower back. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. Depending on which nerves are affected, spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." Spinal Stenosis, Definition, Mayo Clinic staff, Mayoclinic.com, http://www.mayoclinic.com/health /spinal-stenosis/DS00515 (Last accessed September 11, 2012).

26.  There is no indication to what letter Dr. Fishman is referring.

Pugliese had appointments with Dr. Kornbluth on June 12 and July 10, 2009, with "no appreciable change" in her condition. Tr. 460-463.   Dr. Kornbluth continued to prescribe Percocet. Id. Pugliese was "adamant that she need[ed] Percocet more than [was being given]." Tr. 460.

At an appointment on August 7, 2009, Dr. Kornbluth noted that Pugliese's "current pain medications are providing adequate pain relief and improvement in function without side effects." Tr. 458.

A physical examination performed by Daniel L. Pika, a certified physician's assistant, on August 10, 2009, was essentially normal. Tr. 509-510. Also, at that appointment, Mr. Pika reviewed Pugliese's systems.[27]   Tr. 509.   Pugliese did complain of fatigue, arthralgias and difficulty urinating but she denied any eyes, ears, nose, mouth, throat, cardiovascular, respiratory, skin, neurological, psychiatric, endocrine, hematologic/lymphatic, and allergic/immunologic symptoms. Id.

At an appointment on September 4, 2009, Dr. Kornbluth noted that Pugliese's "current pain medications are providing inadequate pain relief and improvement in function without side

27.   The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed September 11, 2012).

21

effects." Tr. 456. Dr. Kornbluth increased the dosage of Percocet from 5 mg to 10 mg. Tr. 456 and 458.

At an appointment on October 2, 2009, Dr. Kornbluth noted that Pugliese's "current pain medications are providing fair pain relief and improvement in function without side effects." Tr. 537. The results of a physical examination performed by Dr. Kornbluth were very similar to the results of the one performed on March 13th, including Pugliese had normal muscle strength in the upper and lower extremities. Id. It was noted that Pugliese had "[m]oderate groin tenderness with a degree of enlarged lymph nodes appreciated." Id.

On October 6, 2009, Pugliese had a consultation with Sarah K. Lentz, M.D., regarding a "right inguinal hernia with lymph adenopathy." Tr. 485-486. The report of that appointment notes that Pugliese was smoking one pack of cigarettes per day. Tr. 485. Other than evidencing signs of a hernia, the results of a physical examination were essentially normal, including Pugliese had full range of motion and normal sensation in her right lower extremity. Tr. 486.

On October 16, 2009, Dr. Lentz performed surgery on Pugliese to repair the right inguinal hernia. Tr. 493-492. The results of a physical examination conducted on October 8, 2009, by Mr. Pika to clear Pugliese for that surgery were essentially

22

normal.  Tr. 491-492.  Mr. Pika again reviewed Pugliese's systems during which Pugliese's answers were the similar to those given on August 10, 2009. Tr. 490-491.  Pugliese denied any psychiatric symptoms. Id.

At an appointment on October 23 2009, Dr. Kornbluth noted that Pugliese had "an increase in pain since the last visit as she had hernia surgery" and that her "current pain medications are providing inadequate pain relief and improvement in function without side effects." Tr. 535.  Dr. Kornbluth increased the dosage of Percocet from every 6 hours to every 4 hours. Id.

On November 7, 2009, Pugliese had an "[u]remarkable CT scan of the pelvis." Tr. 543.

On November 11, 2009, Pugliese had an appointment with Iqbal Singh, M.D., a neurologist.  Tr. 520-522.  Dr. Singh noted Pugliese's history of Lyme disease[28] and hernia surgery. Tr. 520-521.  Dr. Singh's examination of Pugliese revealed normal motor strength throughout except for right hip flexion and knee extension which was weak. Id.  Pugliese's coordination and station examinations were normal. Id.  Dr. Singh noted that Pugliese "limps on her right leg" and had "diminishment to pinprick in the

---

28.  It appears that all of the physician's who treated Pugliese accepted or did not dispute Pugliese's report that she suffered from Lyme disease as diagnosed by Dr. Fishman.  There is no indication that Dr. Singh reviewed the reports of the blood tests.

right anterior thigh." Id.  Dr. Singh concluded that Pugliese suffered from "[r]ight femoral neuropathy" and prescribed the medication Neurotin. Id.

On November 13, 2009, Dr. Kornbluth's examination of Pugliese revealed that Pugliese's gait and station were stable and she was alert and oriented. Tr. 533.  Dr. Kornbluth further stated that "[t]he current pain medications are providing fair pain relief and improvement in function without side effects." Id. Dr. Kornbluth did note "[d]iffuse [right lower extremity] weakness[.]" Id.

An EMG/Nerve Conduction Study performed on November 16, 2009, revealed "no evidence of polyneuropathy, femoral neuropathy or radiculopathy." Tr. 523.  An MRI of Pugliese's brain on November 21, 2009, was normal and an MRI of the cervical spine revealed "a small left paracentral disk protrusion at C2-3, without stenosis." Tr. 542.

On December 2, 2009, Dr. Singh reported as follows: "The patient had an EEG done which showed a few sharp waves but no seizure was recorded.  EMG revealed carpal tunnel syndrome but no femoral neuropathy. Since being on Neurontin . . . her headaches have improved and it has taken away the radiation of the pain down the right leg but she still has right groin pain. She still complains of memory problems secondary to Lyme disease.  MRI of

24

the brain was unremarkable; MRI of C-spine was unremarkable except for a disc bulge at C2/C3." Tr. 519.  Dr. Singh continued the prescription for Neurontin and referred her to the University of Maryland, Department of Neurology.[29] Id.

At an appointment with Dr. Kornbluth on December 4, 2009, Pugliese reported radiation of pain to the right lower extremity but most of the pain was in the groin. Tr. 531. Pugliese denied any low back pain. Id.  A physical examination revealed "[n]o lumbar tenderness" and "[h]ip [range of motion was within normal limits] and without pain." Id.  A straight leg raising test was negative. Id.  During muscular testing, Pugliese gave "limited effort" and had "give-away weakness."[30] Id.  Dr. Kornbluth noted that "[i]t remains difficult to define her symptoms" and "[g]ive-away weakness on exam is of concern." Tr. 532.  Dr. Kornbluth ordered another MRI of the lumbar spine. Id.

The MRI of Pugliese's lumbar spine was performed on December 14, 2009, and was essentially normal. Tr. 539.  It revealed no "significant disk bulges or focal disk herniations"

---

29. We did not find any examination or treatment notes in the record from the University of Maryland, Department of Neurology.

30. "Give-away" weakness is where the patient exerts resistance briefly and then suddenly resistance collapses. This may result from several factors, including pain, poor effort or malingering.

and "no stenosis[.]" Id.  An MRI of the right hip also performed
on December 14th was "unremarkable." Id.

     At an appointment with Dr. Kornbluth on December 18,
2009, Pugliese was complaining of "low back pain and right groin
pain" but there was "no appreciable change in pain since the last
visit." Tr. 528. Pugliese also complained of "radiation" of pain
"to the right lower extremity." Id.  At this appointment,
Pugliese was walking with a cane and had muscular weakness in the
right foot and weakness in the muscles of both thighs. Id.  Also,
although the recent MRI of the lumbar spine was essentially
normal, Pugliese had a positive straight leg raising test on the
left. Id. The record reveals that Pugliese had a final appointment
with Dr. Kornbluth on December 30, 2009, at which she was
complaining of "right iguinal and low back pain" and radiation of
pain to the right lower extremity.  Tr. 526.  Dr. Kornbluth
continued Pugliese's prescription for Percocet and noted that
"[f]or now" he would "continue conservative treatment." Tr. 527.

     On January 7, 2010, Dr. Kornbluth completed a document
on behalf of Pugliese entitled "Multiple Impairment
Questionnaire." Tr. 545-552. Dr. Kornbluth noted that Pugliese
suffered from chronic pain, Lyme disease, pain in the right groin,
status post hernia repair, cervicalgia (neck pain), history of
upper extremity deep vein thrombosis, polyarthralgias (pain in

26

multiple joints) and depression. Tr. 545. There is a partly illegible abbreviation which appears to be "ADHD" which is generally accepted to stand for attention deficit hyperactivity disorder after Dr. Kornbluth's diagnosis of depression. Id. Dr. Kornbluth stated that Pugliese's prognosis was fair. Id.

The only positive clinical findings that Dr. Kornbluth noted as supportive of his diagnosis were as follows; "tenderness in [right] groin" and "lumbar tenderness." Tr. 545. He also noted a "positive Lyme test" and that the frequency of Pugliese's pain was constant and the precipitating factor was Lyme disease. Tr. 546-547.

As for Pugliese's functional work-related abilities, Dr. Kornbluth stated that Pugliese could only sit 0 to 1 hour in an 8-hour workday; stand/walk 0 to 1 hour in an 8-hour workday; frequently lift 0 to 10 pounds; occasionally lift 10 to 20 pounds; frequently carry 0 to 5 pounds; and occasionally carry 5 to 10 pounds.[31] Tr. 548.

---

31. The statement by Dr. Kornbluth that Pugliese could frequently carry 0 to 5 pounds and occasionally carry 5 to 10 pounds is inconsistent with his statement that Pugliese could only stand/walk 0 to 1 hour in an 8-hour workday. To engage in an activity on an occasional basis you have to be able to perform that activity for up to 1/3 of an 8 hour workday and to engage in an activity frequently you have to be able to perform that activity for up to 2/3 of an 8-hour workday. Dr. Kornbluth indicates that Pugliese can carry 0 to 5 pounds for up to 2/3 of an 8-hour work day or 5.3 hours. In order to carry an object, you
(continued...)

With respect to Pugliese's psychiatric problems, she
primarily received treatment from her family physician. Tr. 413.
She did not receive treatment from a therapist or psychiatrist.
Tr. 413. Pugliese was prescribed at various times the drugs
Zoloft, Skelaxin, Xanax, and Antivan. Tr. 305-306, 413, 473 and
521.

On February 5, 2009, Pugliese underwent a one-time
"Clinical Psychological Disability Evaluation" by Joseph
Levenstein, Ph.D. Tr. 413-422. Pugliese told Dr. Levenstein that
she had Lyme disease, depression and Raynaud's disease; and that
she engaged in obsessive compulsive rituals and was very fearful
of people vomiting. Tr. 414.  Dr. Levenstein noted that Pugliese
can shop and make change independently, can cook simple meals, and
manage her medications without difficulty. Tr. 415. Pugliese was
alert and oriented but reported fatigue and depression and anxious
moods. Tr. 416. Dr. Levenstein assessed that Pugliese's short term
memory was in the normal range, but that she had slight
difficulties in retrieval processes; Pugliese's attention and
concentration were erratic and that her perceptual motor
functioning was mildly erratic; and Pugliese experienced
depression with mild mood swings which were more characterological

---

31.  (...continued)
are generally walking.  Dr. Kornbluth indicated that Pugliese
could only walk 0 to 1 hour in an 8-hour workday.

than bipolar. Tr. 417. Dr. Levenstein concluded that Pugliese

suffered from major depressive disorder, moderate, recurrent and a

cognitive disorder, not otherwise specified and had a Global

Assessment of Functioning (GAF) score of 38.[32] Tr. 419. Dr.

Levenstein found that Pugliese had marked limitations in several

areas of mental work-related functioning, including her ability to

carry out detailed instructions, make judgments on simple work-

related decisions and interact appropriately with supervisors and

co-workers. Tr. 421. Dr. Levenstein did indicate that Pugliese had

---

32. The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness. *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id. The GAF rating is the single value
that best reflects the individual's overall functioning at the
time of examination. The rating, however, has two components:
(1) symptom severity and (2) social and occupational functioning.
The GAF is within a particular range if either the symptom
severity or the social and occupational level of functioning
falls within that range. When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the
worse of the two. Thus, a suicidal patient who is gainfully
employed would have a GAF rating below 20. A GAF score of 21-30
represents behavior considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas. A GAF score of 31-
40 represents some impairment in reality testing or communication
or major impairment in several areas, such as work or school,
family relations, judgment, thinking or mood. Id. A GAF score of
41-50 indicates serious symptoms or any serious impairment in
social, occupational or school functioning. Id. A GAF score of
51 to 60 represents moderate symptoms or any moderate difficulty
in social, occupational, or school functioning. Id.

no limitations in her ability to understand, remember, and carry out short and simple instructions. Id.

On March 12, 2009, Michael Suminski, Ph.D., a state agency psychologist, reviewed Pugliese's medical records and Dr. Levenstein's report. Tr. 423-439. Dr. Suminski concluded that Pugliese suffered from major depressive disorder, anxiety disorder and borderline personality disorder. Tr. 425. Dr. Suminski stated that Dr. Levenstein's opinion was an "overestimate of the severity of [Pugliese's] functional restrictions." Tr. 425. Dr. Suminski found that Pugliese was only moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Tr. 423-424. Dr. Suminski concluded that Pugliese "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." Tr. 426.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Pugliese had not engaged

in substantial gainful work activity since September 30, 2008,[33]
the alleged disability onset date. Tr. 21.

At step two of the sequential evaluation process, the
administrative law judge found that Pugliese had the following
severe impairments: "Reynaud's (sic) disease with continued
smoking, urinary retention, inguinal hernia repair, superficial
phlebitis, major depressive disorder, anxiety disorder [not
otherwise specified], and borderline personality disorder[.]" Id.
The administrative law judge found that Pugliese's alleged Lyme
disease was not a medically determinable impairment. Specifically,
the administrative law judge stated in pertinent part as follows:

> Regarding the claimant's alleged Lyme disease, the
> undersigned finds this to not be a medically
> determinable impairment. . .  In September 2008
> the claimant visited Lyme specialist[34] Dr. Fishman
> who found a history consistent with persistent
> Lyme before he obtained multiple lab tests, two of
> which were positive and two of which were negative.
> At least one of the positive tests was not approved
> by the FDA. After examining Dr. Fishman's treating
> notes, state agency medical consultant Carla Huitt,
> M.D., found that there was not enough evidence to
> indicate that the claimant suffers from Lyme's
> disease.  The state agency examiner noted that

---

33. Pugliese stated in her application for disability insurance
benefits that her alleged disability onset date was September 9,
2008 but September 30, 2008, in her application for supplemental
security income benefits. Tr. 153 and 155.

34. There is no evidence in the record indicating that Dr.
Fishman has any specialized training in Lyme disease.  Dr. Huitt
referred to him as a "family doctor/self advertised Lyme's
specialist." Tr. 505.

> Dr. Fishman's conclusions were not supported by
> modern medical standards, nor was his treatment
> of the claimant's alleged Lyme consistent with
> the standard of care for legitimate infections.
> Notably, Dr. Fishman diagnosed Bartonella as well
> although this condition is present only in the
> Pacific Northwest and south central Washington State
> and the claimant testified to not having resided in
> or visited that region. . . .

Tr. 22.

At step three of the sequential evaluation process, the administrative law judge found that Pugliese's impairments did not individually or in combination meet or equal a listed impairment. Tr. 23-24.

At step four of the sequential evaluation process, the administrative law judge found that Pugliese had past relevant skilled, sedentary and light work as a mortgage loan officer and office manager of a cellular phone store and she could not perform that work, but that she had the residual functional capacity to perform a limited range of unskilled, sedentary work. Tr. 24-26. Specifically, the administrative law judge found that Pugliese could perform unskilled, sedentary work

> except the claimant requires occasional use of a cane
> for walking and standing; the claimant can engage in
> no pushing or pulling with her upper extremities; the
> claimant can never climb ladders, ropes or scaffolds;
> the claimant can only occasionally climb stairs and
> ramps, balance, stoop, kneel, crouch, and crawl;
> the claimant is limited to no more than occasional
> fingering; the claimant can have no exposure to
> hazards such as heights and moving machinery; and
> requires placement within 100 feet of a restroom.
> The claimant is limited to jobs with simple, routine
> tasks; to jobs with goal-oriented rather than
> production-paced tasks; to no more than occasional
> interaction with supervisors and co-workers; and to

32

a stable workplace with few if any changes of setting, processes, and tools.

Tr. 24. In concluding that Pugliese had the residual functional capacity to engage in this limited range of unskilled, sedentary work, the administrative law judge relied on the opinions of Dr. Huitt, the state agency physician, and Dr. Suminski, the state agency psychologist, and rejected the opinions of Dr. Fishman, Dr. Kornbluth and Dr. Levenstein. Tr. 24-25.

In rejecting the opinions of Dr. Fishman, Dr. Kornbluth and Dr. Levenstein, relating to Pugliese's work-related physical and mental abilities, the administrative law judge stated as follows:

> As a result of finding that Lyme disease is not a medically determinable impairment, the undersigned necessarily rejects the opinions of Dr. Fishman . . . .
>
> The undersigned gives little weight to the psychological consultation [of Dr. Levenstein]. The findings in this examination are based in significant part on the claimant's self-report of Lyme disease and the resulting symptoms. . . the examination also greatly overstates the claimant's limitations in comparison to the treatment record.
>
> The undersigned also rejects the opinion of Dr. Kornbluth . . . This opinion is conclusory and was reached without examination[35]. . . The opinion is extreme considering the claimant's medical records. The opinion is also based on fully crediting the claimant's allegations and self-reported symptoms, which are not an accurate basis for forming medical opinions.

---

35.  Dr. Kornbluth did not examine Pugliese on January 7, 2010. The most recent appointment was on December 30, 2009, and the record of that appointment does not indicate that Dr. Kornbluth performed a physical exmination of Pugliese. Tr. 526.   The treatment record only reports Pugliese's subjective symptoms. Id.

Tr. 25-26.  The administrative law judge further found that Pugliese's statements concerning her limitations were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, sedentary work. Id.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, sedentary work as described above and the testimony of a vocational expert found that Pugliese had the ability to perform work as a call-out operator and charge account clerk, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 27 and 78-93.

The administrative record in this case which primarily consists of vocational and medical records is 569 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Pugliese's vocational history and medical records in his decision. Tr. 19-27. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 11, Defendant's Brief.

Pugliese  argues that the administrative law judge erred (1) in finding that Pugliese did not have a medically determinable impairment of Lyme disease, and (2) by rejecting the opinions of Pugliese's treating and examining physicians. We find no merit in these two interrelated arguments.

The medical opinion of a treating physician as to the nature and severity of an impairment is only entitled to

34

controlling weight if it is well supported by medically acceptable
clinical and laboratory diagnostic techniques, and is not
inconsistent with the other substantial evidence in the case. 20
C.F.R. § 404.1527(d).  In this case, the administrative law judge
adequately explained why he rejected the opinions of Dr. Fishman,
Dr. Kornbluth and Dr. Levenstein.  The administrative law judge
appropriately relied on the opinion of Dr. Huitt in finding that
Pugliese did not establish a medically determinable impairment of
Lyme disease.  The opinion of Dr. Huitt also supports the
administrative law judge's conclusion that Pugliese could engage
in a limited range of unskilled, sedentary work.  Likewise, the
administrative law judge appropriately relied on the opinion of
Dr. Suminski in rejecting the opinion of Dr. Levenstein and
finding that Pugliese had the mental ability to engage in a
limited range of unskilled, sedentary work.[36]  See Chandler v.
Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)
("Having found that the [state agency physician's] report was
properly considered by the ALJ, we readily conclude that the ALJ's
decision was supported by substantial evidence[.]").  The
administrative law judge appropriately evaluated Pugliese's
impairments and took into account Pugliese's functional
limitations in the residual functional capacity assessment. In
fact, the administrative law judge gave Pugliese the benefit of

---

36.  Dr. Levenstein only examined Pugliese on one occasion soley
for the purpose of rendering an opinion regarding her disability
claim. No special preference is given to the opinion of a non-
treating psychologist.

the doubt and reduced Pugliese's residual functional capacity below the level found appropriate by Dr. Huitt.[37]

The administrative law judge was also justified in rejecting the opinions of Dr. Fishman, Dr. Kornbluth and Dr. Levenstein because their assessments were at least partially dependent on their acceptance of Pugliese's reported symptoms and subjective complaints.

As stated above, the administrative law judge found that Pugliese was not credible to the extent that she claimed that she could not engage in even a limited range of unskilled, sedentary work. The administrative law judge was not required to accept Pugliese's subjective claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v.

---

37. Dr. Huitt, as mentioned previously, concluded that Pugliese could engage in medium work. This encompasses the conclusion that she could engage in light and sedentary work. The regulations of the Social Security Administration provide as follows: "*Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work." 20 C.F.R. § 404.1567(c).

Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997);
see also Casias v. Secretary of Health & Human Servs., 933 F.2d
799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact,
the individual optimally positioned to observe and assess the
witness credibility.").  Because the administrative law judge
observed Pugliese when she testified at the hearing on February
16, 2010, the administrative law judge is the one best suited to
assess the credibility of Pugliese.

Our review of the administrative record reveals that the
decision of the Commissioner is supported by substantial evidence.
We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the
decision of the Commissioner.